## EXHIBIT A

### AFFIDAVIT OF BRIAN DEJOY

I, Brian DeJoy, first being duly sworn, depose and state:

#### I. INTRODUCTION

1.     I am a Special Agent with the Drug Enforcement Administration ("DEA") of the United States Department of Justice, and have been so employed since 1997. I am currently assigned to the DEA New England Field Division, Financial Investigations Team, in Boston, Massachusetts. During my law enforcement career, I have received specialized training regarding the activities of narcotics traffickers, including the methods used to package, store, and distribute narcotics, and the methods used by narcotics traffickers to conceal and launder the proceeds of their narcotics trafficking activities.

2.     In addition to my training, I have had extensive experience in the investigation of the activities of narcotics traffickers. Since joining the DEA, I have participated in more than 150 investigations involving domestic and international drug trafficking organizations as a case agent and in a subsidiary role. I have participated in investigations involving multiple domestic and international jurisdictions including Massachusetts, New York, New Hampshire, New Jersey, Florida, California, Puerto Rico, Colombia, United Kingdom, Panama, Lichtenstein, Switzerland and Venezuela. I have debriefed more than 150 defendants, informants, and witnesses who had personal knowledge about domestic and international narcotics trafficking and money laundering activities. I personally have participated in all aspects of narcotics trafficking investigations, including conducting surveillance, using confidential informants, and conducting court-authorized interceptions of wire and electronic communications.

3.     During the course of my employment with the DEA, I have received specialized

training regarding the activities of narcotics traffickers, including their use of various

communication devices such as cell phones, computers, Internet and e-mail accounts. I have also

received training regarding the methods used by narcotics traffickers to conceal and launder

narcotics proceeds and I have been involved with the investigation of various types of money

laundering techniques including bulk cash smuggling and the utilization of shell and front

companies by drug trafficking organizations. Based on my training and experience, I am also

familiar with the various methods in which narcotics traffickers operating outside the United

States launder their drug proceeds internationally.

4.     I am providing this affidavit in support of a Verified Complaint for Forfeiture *in*

*Rem* against the following property:

> a.     All funds on deposit in HSBC BANK CAUSEWAY BRANCH,
>        WANCHAI, HONG KONG, Account Number 809345143-838, held in
>        the name of L&M EXPORT ELIS COMPANY LIMITED;
>
> b.     All funds on deposit in HANG SENG BANK LTD, Account Number 262-
>        348188-201, held in the name HARRY CHAN & CO., LTD;
>
> c.     All funds on deposit in WING HANG BANK LTD, Account Number
>        704953-060, held in the name of MENTEX GLOBAL LIMITED; and
>
> d.     All funds on deposit in HSBC BANK HONG KONG, Account Number
>        015665979838, held in the name BAOLICAI OVERSEAS OFFSHORE
>        CO., LTD,

(collectively, the "Defendant Properties").

5.     As set forth in more detail below, there is probable cause to believe that the

Defendant Properties are forfeitable to the United States of America on the grounds set forth

below:

(a) The Defendant Properties and the funds contained in them, have been used, and are

- 2 -

currently being used, to launder monetary instruments, domestically and internationally, and to conduct and attempt to conduct financial and monetary transactions in violation of one or more of the following:

  (i)   18 U.S.C. § 1956(a)(1)(A)(i) (laundering to promote specified unlawful activity);

  (ii)   18 U.S.C. § 1956(a)(1)(B)(i) (laundering designed to conceal);

  (iii)   18 U.S.C. § 1956(a)(2)(A) (international laundering to promote specified unlawful activity);

  (iv)   18 U.S.C. § 1956(a)(2)(B)(i) (international laundering designed to conceal);

  (v)   18 U.S.C. § 1957(a) (unlawful monetary transactions over $10,000); and

  (vii)   18 U.S.C. § 1956(h) (money laundering conspiracy).

Therefore, the Defendant Properties, and the funds contained in them, constitute property, real or personal, involved in a transaction or attempted transaction in violation of Sections 1956 and 1957, or property traceable to such property and are forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1);

  (b)   The Defendant Properties contain, and have contained, funds that constitute or are derived from proceeds traceable to offenses constituting "specified unlawful activity," as defined in 18 U.S.C. § 1956(c)(7), incorporating 18 U.S.C. § 1961(1), including the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance, punishable under any law of the United States, and conspiracies to commit such offenses. All such property, real or personal, which constitutes or is derived from proceeds traceable to such violations are forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(C); and

- 3 -

(c)     The Defendant Properties contain, and have contained, funds that constitute moneys, negotiable instruments, securities, and other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of the Controlled Substances Act, or proceeds traceable to such an exchange or moneys, negotiable instruments, and securities used or intended to be used to facilitate violations of the Controlled Substances Act. Therefore, the Defendant Properties are forfeitable to the United States pursuant to 21 U.S.C. § 881(a)(6).

(d)     To the extent that any of the offenses listed above were completed within one year before the seizure sought by this application, it shall not be a defense to forfeiture that the funds currently deposited in the Defendant Properties are not the same funds that were involved in those completed offenses. Pursuant to 18 U.S.C. § 984, the funds currently on deposit in the Defendant Properties are forfeitable to the United States as fungible property in lieu of the funds that were so involved.

6.     The information contained in this affidavit is based on a DEA and Internal Revenue Service ("IRS") investigation into a drug smuggling and money laundering organization that has been using bank accounts both in the United States and outside the United States to facilitate the laundering of illegal drug proceeds in United States currency picked up from the streets of the United States and elsewhere, as more fully described below.

7.     My statements herein are based upon my personal participation in this investigation, which has included interviews with and analysis of reports submitted by Special Agents and Task Force Officers of the DEA and IRS, and other law enforcement personnel assigned to the DEA Task Force and IRS working on this investigation; reviews of translated transcripts of lawfully intercepted telephone conversations and Internet communications among

- 4 -

the targets of the investigation and between the targets of the investigation and undercover agents; meetings with foreign law enforcement officers assisting the investigation; reviews of emails seized pursuant to federal search warrants; interviews of confidential sources of information; and reviews of financial and bank account records and records of wire transfers. I am familiar with all aspects of this investigation. As further described below, in May 2011, the investigation led to an indictment that is now pending entitled *United States v. Aldo Fernando Guerrero-Clavijo et al.*, 11-cr-10187-PBS and the arrest of twelve defendants in Colombia who are pending extradition to the federal court in Boston. The information set forth in this affidavit is based on this familiarity, on information which I have reviewed and determined to be reliable, and on my training and experience investigating narcotics and money laundering organizations.

8.    Since this affidavit is being submitted for the limited purposes of establishing probable cause for the forfeiture of the Defendant Properties, I have not set forth each and every fact learned during the course of this investigation. All references to dates and times are approximate.

## II. OVERVIEW OF INVESTIGATION

## A    The Undercover Money Laundering Investigation

9.    Since 2005, a Massachusetts State Police ("MSP") Trooper (hereinafter "UC-1"), has been acting in an undercover capacity as a money launderer based in Massachusetts. Beginning in May 2007, UC-1 began infiltrating a network of money launderers/money brokers in Venezuela and Colombia through the assistance of a DEA confidential source in Venezuela ("CS-1"). In June 2007, UC-1 began negotiating directly with **CARLOS ORLANDO ZAMBRANO-BRICEÑO**, a Venezuelan money launderer/broker, to pick up and launder large sums of money in New York City. In exchange for a percentage commission, CS-1 told

- 5 -

ZAMBRANO that his associate in the United States ("UC-1") could pick up the money and wire it from UC-1's bank accounts (a series of DEA undercover bank accounts in Massachusetts) to other bank accounts at ZAMBRANO's direction.

10. The investigation, which began in early 2007 and concluded in June 2011, uncovered an elaborate money laundering operation involving a network of other conspirators located in Venezuela, Colombia, and elsewhere who have used the Defendant Properties, among other bank accounts, to launder tens of millions of United States dollars in drug trafficking proceeds in the United States and elsewhere back to the source of supply for cocaine in Colombia. In general terms, the operation works as follows:

a. The conspirators are members of, or work for, a drug trafficking organization based in Medellín, Colombia, known as *La Oficina de Envigado* (the "Colombian Cartel"). The Colombian Cartel imports illegal narcotics into the United States and Europe for further distribution. After the narcotics are distributed in the United States and elsewhere, the Colombian Cartel needs to collect and launder the proceeds generated by the sale of the narcotics.

b. The conspirators include "money brokers" based in Colombia and Venezuela who enter into arrangements or "contracts" with the Colombian Cartel to take physical possession of the cash generated and collected from drug sales, in the United States and Europe, that the Colombian Cartel needs to be picked up off the street and placed into, and passed through, the United States financial or banking system. The brokers arrange to have couriers deliver the drug proceeds to money launderers working for or with the brokers. Often, the Colombian Cartel compensates the brokers by paying them a percentage of the amount of drug proceeds that are laundered.

          c.      On at least fifty-nine (59) occasions, between May 2007 and May 2011, the conspirators have caused money couriers to deliver for laundering large amounts of United States currency, and on a few occasions, currency in Euros, all of which I have probable cause to believe constituted drug proceeds. The deliveries of drug proceeds took place in the District of Massachusetts in the cities of Boston, Woburn, Revere and Somerville; in several other U.S. cities including New York City, Philadelphia, Los Angeles, Houston, Chicago, Orlando and San Juan; and several locations outside the United States, including Guatemala, Mexico, Sint Maarten, and Italy. The deliveries of drug proceeds were made to persons holding themselves out to be professional money launderers, but who, in reality, were undercover law enforcement agents ("UC agents") working with the DEA or foreign law enforcement agencies. The UC agents accepted delivery, or picked up, the drug proceeds at the direction of the brokers, transferred the drug proceeds into undercover bank accounts controlled by the DEA in both New York and Massachusetts, and then wire-transferred the drug proceeds into accounts designated by the brokers, including the Defendant Properties.

          d.      As part of the investigation, the DEA set up undercover bank accounts in the District of Massachusetts and the Southern District of New York to receive the drug proceeds and, following the instructions from the brokers, to wire the drug proceeds to other bank accounts both inside and outside the United States.

          e.      The broker-conspirators contacted UC-1 and gave him telephone numbers and "safe codes" to be used during the pick up of drug proceeds. UC-1 and other UC agents used these codes and contact information to contact the money couriers, arrange for the pick up of drug proceeds, and, finally, to actually pick up the drug proceeds. The broker-conspirators paid

the UC agents a commission for their laundering services, usually between five percent (5%) to ten percent (10%) of the amount of currency picked up.

  f. There is probable cause that the large amounts of currency that the conspirators arranged to deliver to undercover agents involved in the DEA undercover money laundering operation (the "UC Operation") were in fact drug proceeds. First, the manner in which these transfers of large amounts of currency took place had many indicia of drug trafficking. The physical transfer of the drug proceeds to UC agents from the money couriers generally occurred in public places such as busy streets or parking lots. At times, the money couriers delivering the money retrieved it from electronic hidden compartments in their vehicles. The currency was also often contained in heat-sealed bags and/or contained materials, like dryer sheets or scented towels, designed to mask any narcotic odor on the currency. Second, on multiple occasions, UC-1 and other UC agents have had recorded conversations with the targets of the investigation about purchasing large quantities of cocaine and/or heroin from the targets and how the money being delivered was "clean" from any narcotic odor. In February 2011, the DEA made a controlled purchase of a "sample" kilogram of cocaine in Colombia from one of the primary targets of the investigation. Third, on at least two occasions, in Texas and in Rome, Italy, law enforcement agents made seizures of cocaine in connection with the organizations making the deliveries of currency to the UC Operation. On at least one occasion, during a transaction in Rome, Italy, the drug proceeds had visible traces of cocaine powder.

  g. Upon delivery of drug proceeds to the UC agents, the broker conspirators provided wire transfer instructions to UC-1. The conspirators often emailed the wire transfer instructions from their respective email addresses to UC-1's undercover email address. Although

- 8 -

the ultimate destination of the drug money was Colombia, where *La Oficina de Envigado* is based, the conspirators typically instructed UC-1 to wire the money from UC-1's Massachusetts bank accounts to financial institutions in the United States, Panama, the Carribean, Portugal and Hong Kong. During these transactions, UC-1 had multiple communications with the broker conspirators and their criminal associates in recorded telephone calls, emails, MSN Instant Messages, and Blackberry Pin-to-Pin communications about the pick ups, the transportation of the money, and the ultimate transfer of the money from UC-1's accounts to destinations identified by the brokers. For the most part, each of UC-1's pertinent telephone calls and other communications to and from the broker conspirators were conducted while UC-1 was in Massachusetts. Once UC-1 completed each of the wire transfers, UC-1 generally emailed the money brokers confirmation of the wire transfers which identified the banks from which UC-1 was sending the money as being located in Massachusetts or, on a few occasions, from New York City.

11.     The undercover money laundering operation, the UC Operation, began with picking up large sums of drug money in New York City for CARLOS ZAMBRANO. Between May and September 2007, at ZAMBRANO's direction, UC-1 and other undercover ("UC") agents picked up more than $1.5 million in cash in New York City and wire transferred the money to series of accounts at Bank of America ("BOA") that were each listed under a variation of the name "Rosemont Corporation." Each of these "Rosemont" accounts at BOA were also in the name of, and controlled by, various *casa de bolsas* (exchange houses) in Venezuela from which the DEA in March 2009 seized more than $151 million.

12.     In early 2008, ZAMBRANO introduced UC-1 to a group of other money

- 9 -

launderers brokers/brokers, including **JOHAN LEONARDO JAUREGUI VARGAS** and
**ALDO FERNANDO GUERRERO CLAVIJO, a.k.a. "Rolo."** The investigation revealed that
both JAUREGUI and GUERRERO were directly involved in the importation of cocaine into the
United States and Europe and that GUERRERO worked directly for a drug cartel based in
Medellín, Colombia known as *"la Oficina de Envigado."* In January and March 2008,
ZAMBRANO, GUERRERO, and JAUREGUI directed UC-1 to pick up approximately $2
million in Guatemala. During one internet Instant Messenger ("IM chat") conversation,
GUERRERO informed UC-1 that he was in charge of these operations: "*every card* (dollar) *in
Guate* (Guatemala) *or in the DF* (Districto Federal, Mexico) *are mine, they are only the buyers*
(on the black market currency exchange).

13.     On February 26, 2010, another DEA UC agent working with UC-1 ("UC-2") met
with JAUREGUI in Sint Maarten about laundering $300,000 for JAUREGUI. During this
meeting, UC-2 also met with the purported owner of the drug money that needed laundering,
DANIEL OSORIO GARCIA[1]. During this meeting, which was recorded, JAUREGUI told UC-2
that the arrival of the money was delayed because it was being transported by commercial boat,
that it was wet and had a strong odor. In the same meeting, in OSORIO's presence, JAUREGUI
talked to UC-2 about different cocaine trafficking ventures, including a new commercial airline
route to the United States from Peru. On March 11, 2010, UC-2 again met with JAUREGUI and
took possession of $179,000 in cash. After the delivery of cash, JAUREGUI had further
discussions with UC-2 about other money laundering operations and cocaine trafficking
opportunities. Following JAUREGUI's instructions that UC-1 received via email, the DEA wire

---

[1]OSORIO is currently a fugitive and his whereabouts are unknown.

transferred the funds (minus the DEA's commission) to an account in Panama. Later that year, on August 11, 2010, UC-1 met with JAUREGUI in Amsterdam. Although the meeting was not recorded (because of local legal requirements), UC-1 spoke with JAUREGUI at length about his ongoing money laundering and drug trafficking activities.

14.     On May 12, 2011, a grand jury sitting in the District of Massachusetts returned an indictment in criminal case 11-cr-10187-PBS charging (1) ALDO FERNANDO GUERRERO CLAVIJO, a.k.a. Carlos Fernando Guerrero C, a.k.a. "Zeus," a.k.a. "Rolo"; (2) NELSON ALVARO ARTEAGA-ESPINOZA, a.k.a. "Pastuso"; (3) JUAN CARLOS GOMEZ-PRECIADO, a.k.a. "Camilo"; (4) ANDRES CADVID COVELLI, a.k.a. "Don Andres," a.k.a. Andres Torres Landines; (5) JOHAN LEONARDO JAUREGUI VARGAS, a.k.a. Jhojan Jauregui Frias, a.k.a. "Leo"; (6) CARLOS ORLANDO ZAMBRANO-BRICEÑO, a.k.a. "Ajigbotifa Agunsola"; (7) JOSE ALBERTO CARMINE COLMENARES; (8) EDUARDO PABUENCE, a.k.a. Eduardo Vene; (9) WILSON ORLANDO SERNA-HOYOS, a.k.a. "El Mono"; (10) PEDRO JOSÉ AMADO MONTILLA, a.k.a. "El Viejo"; (11) JAIME TORRES-RODRIGUEZ; (12) WYLLSEYN MARQUEZ-GOMEZ; (13) FREDDY FRANCISCO CAICEDO; (14) GUILLERMO VILLEGAS ZULUAGA, a.k.a. "Memo"; (15) JUAN CARLOS GUADALUPE-NUNEZ, a.k.a. "El Viejo"; (16) DANIEL OSORIO GARCIA; (17) JULISSA PEREZ; (18) HENDERSON MARTINEZ, a.k.a. "Juan"; (19) ROBERTO TORRES-COLON, a.k.a. "Chappa" with, among other charges, money laundering, conspiracy to launder monetary instruments. The indictment also charges GUERRERO, ARTEAGA, and a third defendant, RIGOBERTO MURIEL-TORRES, a.k.a. "la Erre" with conspiracy to import cocaine into the United States and to manufacture and distribute cocaine for unlawful importation into the United

- 11 -

States in violation of 21 U.S.C. § 963.

15.     On June 1, 2011, members of the Colombian National Police ("CNP") arrested

twelve of the nineteen defendants listed above in Colombia pursuant to a provisional arrest

request from the United States Attorney's Office in District of Massachusetts, including

GUERRERO and JAUREGUI.  Each of these twelve defendants are pending extradition to the

United States.  On the same day, members of the DEA also arrested PEREZ and MARTINEZ in

Massachusetts.  The remaining five defendants, including ZAMBRANO[2], are fugitives.

**B.      The Black Market Peso Exchange**

16.     Based on my training and experience, and the experience of other law

enforcement agents, I am generally familiar with what is known as the Black Market Peso

Exchange ("BMPE").  As further described below, a number of the bank accounts described

herein, including the Defendant Properties, have been used to launder drug money on the BMPE.

The BMPE is a trade-based money laundering scheme used by Colombian narcotics traffickers to

facilitate a non-regulated exchange of United States dollars ("USD" or "dollars") for Colombian

pesos ("COP").  In general terms, the BMPE operates as follows:

            a.      Colombian drug traffickers hold large quantities of narcotics proceeds in

USD that they need to convert into their local currency for use in Colombia.  At the same time,

Colombian and other South American businesses are in need of USD to pay for "imported"

goods or services and often seek dollars on the BMPE so they can avoid government scrutiny -

---

[2]Despite the public nature of the indictment and the arrests in Colombia, ZAMBRANO, who is
believed to be reside in Venezuela, appears to be unaware of the pending charges against him and has
continued in engage in conversations with UC-1 about money laundering pickups, as recently as January
2012.

including import duties, sales taxes, and income taxes - and obtain or "purchase" USD at a more favorable exchange rate than the official market rate. For example, all USD payments for goods imported into Colombia on the formal exchange market are supposed to be reported to the Central Bank of Colombia, the *Banco de República*, and the Colombian customs and taxing authority, the *Direccion de Impuestos y Aduanas Nacionales* ("DIAN"). Nevertheless, many Colombian businesses do not pay for imports using the formal exchange system, but instead purchase USD from money brokers on the BMPE market. A significant source of these dollars for these transactions is drug proceeds.

        b.      In a typical BMPE currency exchange transaction, a BMPE money broker arranges with a Colombian drug trafficker or their representative to "purchase" USD from the drug trafficker. The BMPE broker agrees to purchase dollars from the drug trafficker with Colombian pesos at a heavily discounted exchange rate. The BMPE broker then finds Colombian or other South American customers - usually businesses that need dollars to pay for imports or other foreign services, including import services - and sells the Colombian or South American customers the USD and the right to use those dollars, including the actual wire transfer of those dollars that are on deposit in a U.S. bank account. The BMPE broker negotiates a dollar/peso exchange rate lower than the formal currency exchange market rates, but higher than what the broker paid for the dollars from the drug trafficker on the black market. While the BMPE broker does not explicitly represent the source of the dollars to be drug proceeds, the fact that these United States dollars are from the proceeds of narcotics trafficking is common knowledge in Colombia and elsewhere in Latin America and Carribean countries that export goods to Colombia.

- 13 -

c.      The Colombian and South American customers inform the broker where the "purchased" dollars need to be delivered, usually by means of wire transfer. Typically this is done by providing the money broker and, in turn, drug trafficking organization, via facsimile or email, wiring instructions for a particular bank account in the United States. In many cases, the money broker will provide the drug trafficker a printed list of wire transfer instructions for various United States banks and companies with the dollar amount for each wire transfer handwritten on the document. At times, these wire instructions include wiring instructions for banks outside the United States, most often in Panama or Hong Kong. In this way, the actual movement of drug dollars is divided into multiple wire transfers to various bank accounts in smaller dollar amounts in order to conceal the illicit nature of the funds. The dollars transferred into the accounts are drug proceeds, but are used to pay for goods or services on behalf of the broker's Colombian and South American customers. Thus, a typical indication of a BMPE arrangement occurs when a United States based company exports goods or services to an entity in Colombia, but receives payment for those goods or services from a third party, unrelated to the underlying transaction. The transaction is also often masked as the repayment of a "loan" from the third party in order conceal the illicit nature of the transaction.

d.      Once the transfer is executed, the broker gives his Colombian or South American customers proof the dollars were sent, usually by emailing copies of the wire transfer confirmations, and pays the broker Colombian pesos at the previously negotiated exchange rate. The broker, in turn, transfers the pesos he receives from his customers to the drug trafficker that sold him the dollars and the broker retains the profit he made on the difference in the exchange rates.

- 14 -

## III. OVERVIEW OF Defendant Properties

### A. HSBC BANK CAUSEWAY BRANCH, WANCHAI, HONG KONG, Account Number 809345143-838, held in the name of L&M EXPORT ELIS COMPANY LIMITED ("HSBC-3838")

17.     HSBC-3838 is an account at HSBC Bank Hong Kong (Hongkong and Shanghai Banking Corporation), which is based in the United Kingdom, but is one of the largest financial institutions in the world with offices both in the United States and Hong Kong. HSBC-3838 is located at a particular branch in Hong Kong, HSBC Causeway Bay Branch 1/F, Causeway Bay Plaza Ii, 463-483 Lock Hart Road, Causeway Bay Hong Kong. The account is listed under the name of *L & M EXPORT ELIS COMPANY LIMITED*, with an address in Hong Kong of Flat B.13/F, Kiu Fu Commercial Building 300-306, Lock Hart Road Wanchai, Hong Kong. According to public records, including internet research, *L & M EXPORT ELIS COMPANY LIMITED*, appears to be in the business of importing and exporting products for third parties. On January 7, 2011, from an undercover bank account in Massachusetts, the DEA wired a total of $52,000 in drug money to HSBC-3838 out of a total of $486,667 in drug money the UC Operation picked up in Puerto Rico.

### B. HANG SENG BANK LTD, Account Number 262-348188-201, held in the name HARRY CHAN & CO., LTD ("HANG-8201")

18.     HANG-8201 is an account at Hang Seng Bank Ltd, one of the largest banks in Hong Kong which is majority owned by HSBC. HANG-8201 is listed under the name of *HARRY CHAN & CO., LTD.* According to public records, including internet research, *HARRY CHAN & CO., LTD* is an export trading company that specializes in toys, stationery, household, gifts and handbags. On January 7, 2011, from an undercover bank account in Massachusetts, the

- 15 -

DEA wired a total of $100,000 in drug money to HANG-8201 out of a total of $486,667 in drug money the UC Operation picked up in Puerto Rico.

## C.    WING HANG BANK LTD, Account Number 704953-060, held in the name of MENTEX GLOBAL LIMITED ("WING-3060")

19.    WING-3060 is an account at Wing Hang Bank Ltd. which is based in Hong Kong, but was originally founded in Guangzhou, in the People's Republic of China. WING-3060 is listed under the name *MENTEX GLOBAL LIMITED*, with an address in Hong Kong of Unit 905, 9/F, 135 Bonham Atrand Trade Center, 135 Bonham Strand, Hong Kong, Sheungwan. According to public records including internet research, *MENTEX GLOBAL LIMITED* is an international shipper/exporter of freight and products via ocean containers. On January 7, 2011, from an undercover account in Massachusetts, the DEA wired a total of $200,000 in drug money to WING-3060 out of a total of $486,667 in drug money the UC Operation picked up in Puerto Rico.

## D.    HSBC BANK HONG KONG, Account Number 015665979838, held in the name BAOLICAI OVERSEAS OFFSHORE CO. LTD. ("HSBC-9838")

20.    HSBC-9838 is an account at HSBC in Hong Kong. HSBC-9838 is listed under the name *BAOLICAI OVERSEAS OFFSHORE CO. LTD.*, with an address of Unit 16-F Cheuk Nang, Hong Kong. On March 15, 2011, from an undercover account in Massachusetts, the DEA wired a total of $399,990 in drug money to HSBC-9838 out of a total of $1,300,090 in drug money the UC Operation picked up in Orlando, Florida on March 9, 2011.

## IV. UNDERCOVER WIRE TRANSFERS INTO THE DEFENDANT PROPERTIES

### A. Undercover Money Laundering Pickup of $486,667 in Drug Proceeds in San Juan, Puerto Rico, on January 4, 2011

21. On January 4, 2011, following the directions of CARLOS ZAMBRANO, a

Venezuelan money-broker/launderer, the UC Operation picked up $486,667, in drug proceeds in

Puerto Rico. The drug money was contained in a carton box and was delivered to a DEA

undercover agent in a shopping center parking lot in Carolina, Puerto Rico. Prior to the delivery

of the money, the individual who delivered the money, identified as Manuel Del Rosario,

provided a safe code of *'de parte de Chepe"* and indicated to the UC agent that the money was

"clean" (that is, free from any narcotic odor).

22. After this delivery of the money, on January 5, 2011, ZAMBRANO emailed UC-1

a series of five bank accounts along with exact dollar amounts for each wire transfer. Among

these five accounts, were the following accounts located in Hong Kong:

> BANK: HSBC HONG KONG
> COMPANY NAME: L & M EXPORT ELIS COMPANY LIMITED
> ADDRESS: FLAT B.13/F, KIU FU COMMERCIAL BUILDING 300-306
> LOCK HART ROAD WANCHAI, HONG KONG
> ACCOUNT NO. 809345143-838
> BRANCH ADDRESS: HSBC CAUSEWAY BAY BRANCH 1/F, CAUSEWAY
> BAY PLAZA II, 463-483 LOCK HART ROAD,
> CAUSEWAY BAY HONG KONG
> AMOUNT: $52,200

> BANK: HANG SENG BANK, HONG KONG
> BENEFICIARY: HARRY CHAN & CO., LTD
> ACCOUNT NO. 262-348188-201
> BENEFICIARY BANK: HANG SENG BANK LIMITED
> ADDRESS: HONG KONG HEAD OFFICE 83 DESVOEUX ROAD CENTRAL,
> HONG KONG
> AMOUNT: $100,000

- 17 -

NAME OF BENEFICIARY BANK: WING HANG BANK LTD
ADDRESS: 161 QUEEN'S ROAD, CENTRAL HONG KONG.
BENEFICIARY ACCOUNT NO. 704953-060
NAME OF BENEFICIARY: MENTEX GLOBAL LIMITED
ADDRESS OF BENEFICIARY: UNIT 905, 9/F. 135 BONHAM ATRAND
TRADE CENTER, 135 BONHAM STRAND, HONG
KONG, SHEUNGWAN
AMOUNT: $200,000

In addition to these accounts, which are described above as HSBC-3838, HANG-8201, and

WING-3060, ZAMBRANO also provided UC-1 with wiring instructions, for a wire transfer of

$94,420, to an account in Brooklyn, New York City under the name *Velgelt LLC* held at HSBC

Bank USA.

23.     After the DEA took possession of the drug money in Puerto Rico, the $486,667 in

United States currency was wired back to undercover bank accounts in the District of

Massachusetts. On January 7, 2011, following Zambrano's email instructions, the DEA wired

$52,000 to HSBC-3838, $100,000 to HANG-8201, and $200,000 to WING-3060. Based on my

training and experience, these transactions were consistent with the laundering of drug money on

the Black Market Peso Exchange ("BMPE") whereby a vendor in Colombia or Venezuela

purchases drug dollars in the United States from a money broker/launderer (like CARLOS

ZAMBRANO) at a reduced rate and who, in exchange, provides the money broker with local

currency (pesos or Bolivars) that is in turn delivered to the narcotics trafficker.

## B.     Undercover Money Laundering Pickup of $1,300,090 in Orlando, Florida on March 9, 2011

24.     On March 9, 2011, following the instructions of JOHAN LEONARDO

JAUREGUI VARGAS, the UC Operation picked up $1,300,090 in drug proceeds in Orlando,

Florida. During the UC Operation, UC-1 and another UC agent have had direct, face-to-face

- 18 -

meetings with JAUREGUI about the laundering of drug money as well as discussions about the importation of cocaine into the United States. JAUREGUI is currently detained in Colombia pending extradition to Massachusetts on the money laundering charges in the indictment issued in criminal case 11-cr-10187-PBS.

25.    During the undercover pickup of drug money in Orlando, Florida, UC-1 had multiple phone calls, emails and MSN internet chats with JAUREGUI about the total amount of money that was picked up in Florida. During these communications, JAUREGUI told UC-1 that the individual who delivered the money in Florida was a brother of the owner of the drug money in Colombia. After this pickup of drug money, UC-1 received a series of emails from JAUREGUI that contained wiring instructions for bank accounts in Florida, California, New York, Panama, and Hong Kong. Specifically, on March 11, 2011, UC-1 received an email from JAUREGUI that read *"THIS IS FOR 399,990 PLEASE"* and included as an attachment wiring instructions for the following bank account: HSBC BANK HONG KONG, ACCOUNT NUMBER 015665979838, BENEFICIARY:BAOLICAI OVERSEAS OFFSHORE CO. LTD, UNIT 16 F CHEUK NANG, HONG KONG. Days later on March 14, 2011, UC-1 received another email from JAUREGUI in that read, *"Hello how are you, I need proof of transfer for the 399.990 because the man has been looking for it and nothing has arrived."* The same day, UC-1 responded and informed JAUREGUI that the wire transfer to the Hong Kong account (HSBC-9838) would need to go out the next day because of the amount of money involved and that UC-1 needed some fraudulent paperwork to document the legitimacy of the funds being transfer: *"This one is programed to go out tomorrow. That amount cannot go in and come out so quickly, it brings problems. And I think I am going to have to generate some paperwork to justify that exit*

- 19 -

*(*wire transfer*). "*

26.     Thereafter, following JAUREGUI's email instructions, on March 15, 2011, from
an undercover bank account in Massachusetts, the DEA transferred $399,990 in drug money to
HSBC-9838 out of a total of $1,300,090 in drug money the UC Operation picked up in Orlando,
Florida on March 9, 2011. Following the transfer, UC-1 emailed JAUREGUI the confirmation
for the outgoing wire transfer, which indicated that the transfer to HSBC-9838 was from a bank
account located in Massachusetts.

27.     As indicated above, the Defendant Properties, HSBC-3838, HANG-8201, WING-
3060 and HSBC-9838 are each located in Hong Kong and appear to be associated with
businesses in Hong Kong involved in the international import/export business. In addition to the
undercover money laundering transfers described above, based on records from Fed Wire records
from the Federal Reserve Bank of New York, there are other transactions with businesses in
Latin America involving the Defendant Properties that appear to be consistent with BMPE type
transactions. Some of these transactions are between the Defendant Properties and United States
banks that the DEA has identified as being involved in the laundering of drug money on the
BMPE and are accounts with which the DEA has had undercover money laundering transactions.

28.     For example, on September 14, 2010, September 27, 2010, and on October 19,
2010, HSBC-3838 (L&M Exports) received a wire transfers in the amounts of $31,000, $60,000,
and $50,347 from U.S. banks accounts listed under the name *Ci Del Istmo S.A.*, including
Citibank Account No. 36909785 in New York City (the October 10, 2010 transfer), listed under
the name, *Ci Del Istmo S.A.*, Bogota, Colombia (CITI-9785). Simiarly, on June 22, 2011, one of
the Defendant Properties, HSBC-9838 (*BAOLICAI OVERSEAS OFFSHORE*), received an

- 20 -

incoming wire transfer of $53,000 from *Ci Del Istmo, S.A.* On September 3, 2010, following

GUERRERO's instructions, the DEA wired $81,292 to CITI-9785 (*Ci Del Istmo*) out of

$367,845 in drug proceeds the UC Operation picked up in Chicago, Illinois on September 1,

2010.

## IV. CONCLUSION

29.     Based on the foregoing, I submit that the Funds are forfeitable to the United States

pursuant to the statutes cited above.

30.     I, Brian Dejoy, a Special Agent with the U.S. Drug Enforcement Administration,

declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Affidavit is

based upon reports and information known to me and/or furnished to me by law enforcement

agents, and that everything represented herein is true and correct to the best of my knowledge and

belief.

Executed on this day of January, 2012

Brian Dejoy
Special Agent
Drug Enforcement Administration

- 21 -